We'll hear argument first this morning in Case 12-547, Metrish v. Lancaster. Mr. Bursch. Thank you, Mr. Chief Justice, and may it please the Court. This is a Sixth Circuit habeas appeal involving AEDPA deference. Harrington v. Richter holds that a Federal court may only overturn a State court conviction that is such an erroneous misapplication of this Court's clearly established precedent as to be beyond any possibility of fair-minded disagreement, that is, an extreme malfunction. Here, a fair-minded jurist could conclude that the Michigan Supreme Court's Carpenter decision was neither indefensible nor unexpected when it simply applied plain statutory language in accord with well-established Michigan interpretive principles. Accordingly, the Michigan Court of Appeals' application of Carpenter was not error and the Sixth Circuit should be reversed. I'd like to begin with the statutory text. In 1975, the Michigan legislature passed a comprehensive mental capacity affirmative defense statute. In it, the defenses are defined for mental illness and mental retardation, but it says nothing about diminished capacity. And that silence is crucial here because in Michigan, for over 200 years, it has been a code jurisdiction, which means that if the statutes address a particular area of criminal law, only that statute applies and the Michigan courts are not allowed to either add to or subtract from that statutory text. So only the Michigan legislature had the power to add a diminished capacity defense. Sotomayor's 200 years, you say that? Yes, actually, even before Michigan was a territory, before it was a State, in 1810, it passed a law that abolished common law criminal principles when there was a statute that addressed the subject matter. There was some law in effect in Michigan on this subject from the year 1973 till the year 2001. There was no statute and there was no ancient common law, but what was it? If I ask you the question, what was the law in Michigan on diminished capacity from 1973 to 2001, what would you respond? It changed one time. In 1973, there was a Michigan court of appeals decision that recognized as a matter of common law the diminished capacity defense, but that was set aside by the 1975 statute, which established all the comprehensive diminished capacity defenses available and left out diminished capacity. So in 1975, 1976, you know, 1978. How was the Michigan court of appeals construing the defense, did it say? It didn't say anything about the 1975 statute? Well, what the Michigan court of appeals did beginning in 1978 in the Mangiopane case was to ask, is diminished capacity part of the statutory code? And it never held expressly that it was. What it did in Mangiopane and in subsequent cases, it assumed that the defense existed, but it never held that. And that dicta could not override the plain language of the statute. And, in fact, counsel on the other side has not pointed to a single Michigan decision where a conviction or an exoneration, an acquittal, or even a finding of ineffective assistance was ever based on the diminished capacity defense. Was the 1973 case that you mentioned based on a statute, or was it based on, allegedly, a vacuum that the statute's storage structure allowed the court to fill? I mean, is that the way the 1973 case worked? And was the 1973 case followed by other courts, or was it just an isolated precedent? The 1973 case was a common law vacuum, Justice Kennedy, where the Michigan legislature had not yet spoken about mental incapacity defenses. And so it stood alone, as the Court was able to do, as a common law decision. There were no other cases that relied on it before the 75 statute was enacted. And after that point, the Michigan appellate courts did not look to the 72 decision as the source of the doctrine. They assumed that if it existed, it must be somewhere within the statute. And then in Carpenter in 2001, the Michigan Supreme Court, when finally the very first Michigan court to look at the question explicitly says, well, it's not in the statute. Diminished capacity isn't there. We've got mental retardation. We've got mental illness. No diminished capacity. As the Michigan judiciary, we lack the power to add the diminished capacity defense. Alito, please. Alito, we don't really have to reach this issue in this case, according to your submission. But what would happen if a State, an intermediate State appellate court said the law is such-and-such, and then a person is tried in the interim, is tried, and subsequently the State supreme court says that intermediate State court decision was incorrect? That never was the law of the State. The law was exactly the opposite. I think you would apply the same principles to that hypothetical as you did in Rogers. And in Rogers, you had a nearly 100-year common law history of the year-and-a-day rule in the Tennessee supreme court that the defense was available to use that term for nearly 100 years. And yet it didn't violate due process in Rogers for the Tennessee supreme court to abolish the rule because it was neither indefensible nor unexpected. Now, this case is much easier than Rogers, or your hypothetical, for several reasons. First, as I mentioned, it's a habeas case, and so we've got the layer of edpa deference that wasn't there. Second, we're not talking about the evolution of the common law like we were in Rogers. We're talking about a statute, and the statute meant what it said in 75, just like it did in 01, just like it does today. And the last thing is that in the Rogers case, even the Tennessee supreme court acknowledged there was a change. And here, the Michigan supreme court said there was no change, because the statute said what it said in 1975, and that meant no diminished capacity. Alitoso, what I'm wondering is how we even get beyond the statement, the holding by a State supreme court regarding the law of the State. Don't we have to accept that as the law of the State? Isn't that what our decision in Fiori says? If the State supreme court says this is the law and it's always been the law, then how can we second-guess that? Well, Justice Alito, I would think about it in two pieces. In the first piece is, can you second-guess the Michigan supreme court's interpretation of the statute? And I think the answer there, everybody has to agree, is no. The State's interpretation of its own statute binds this Court, binds all Federal courts, just like the South Carolina supreme court decision in Booey did. With respect to the Michigan supreme court's analysis of the retroactive effect, I agree that Fiori stands for that very proposition, and I think Indiana makes that case very forcefully in the multi-State amici brief. You don't have to reach that question here, however, because given the AEDPA standard and the fact that the Michigan supreme court decision was so clearly not a misapplication of Rogers and Booey, it makes this a relatively easy case. But I think you'd be fully within your right to follow the Fiori holding. You suggested, General, the fact that this is statutory makes your position easier. Yes. And I wonder if that's true. I mean, you could see an argument the exact other way, which suggests that we all understand that common law changes and evolves over time, but that it's rare for a court to reverse a decision on what a statute means, and that that's not foreseeable in the same way. So, you know, especially if it were a single court saying the statute means A today and then tomorrow it comes back and it says, no, it means B, whether that isn't actually — whether that wouldn't cut against your position. Justice Kagan, I think this is the easiest case because it's not just statutory interpretation. It's statutory interpretation of a statute that is just plain on its face. If you had an ambiguous statute, you know, then maybe there would be some more uncertainty. But where you've got a statute that enumerates several defenses, does not include And under Michigan law, if it's not enumerated, it's not there and the courts can't add it. That does make this easier. I think it was probably a bigger challenge in Rogers, for example, to acknowledge that, one, Tennessee law had changed right out from underneath the defendant, and yet even given that change, this Court was comfortable that it was not indefensible or unexpected. I think when it's — What about the Michigan Court of Appeals? There's only one Court of Appeals, right? Correct, Justice Ginsburg. And so that Court several times recognized diminished capacity as a defense. Well, it didn't recognize it as a defense in the sense that it analyzed the statute and said, yes, the defense is available. It, in many instances, assumed that it might exist, and if it did, then this is the result. The closest it comes is this Mangiopane decision in 1978. And the Court says very specifically there that the definition of mental illness in the statute is similar to diminished capacity. But the Court says at page 247 of the Northwest Second Report, the Court was not prepared to say they are identical. So the Court of Appeals, the Court of Appeals, recognizes that there were 130 appellate cases in which the defendant was not identified as having diminished capacity as a defense. Recognizing it as a possible defense. Again, in every single one of those cases, all of which would be contrary to the statutory language, incidentally, not a single one of them did a conviction or an acquittal or a finding of ineffective assistance ever churn on that point. And so in that sense, it's also, again, very much like Rogers, where this Court said that the year-and-a-day rule had never been used for an acquittal or a conviction in any Tennessee case. And so the question is, again, through the EDPA deference lens, which is very high, was the Carpenter decision defensible and expected? And we would submit that any time that a State supreme court applies the plain language of a statute in accord with established principles of interpretation in that State, it could almost never be indefensible or unexpected. Sotomayor, that seems a little strange for the following reason. Just as I think this case presents an example. You're claiming it's clear because the Supreme Court said it was clear. But the court of appeals in Mangiopan, whether or not it assumed it or not, did an analysis that clearly says that it believes that the definition of legal insanity includes diminished capacity. Its holding didn't need that analysis because it could have assumed it and then just said, but no notice was given, so the defense fails here. But it took the time to analyze just this question and came to a contrary conclusion. Its contrary conclusion was that legal insanity was a broad enough term under Michigan law to encompass this defense. The court of the State supreme court has now said, no, it's not. But I don't know that that makes the statute any less ambiguous merely because the court announces that it thinks it's not. Two responses to that, Justice Sotomayor. First, I want to be, again, very careful about what Mangiopani actually held. It did look at the statutory language and at page 247 said, We are not prepared to say they are identical, meaning the definition of mental incapacity is diminished capacity. The question was procedural because the defendant had not given the prosecutor notice of any defense based on mental capacity in the trial court. And so the court said, well, you know, assuming that the defense exists, we are not prepared to decide that today. And he would have had to give statutory notice. I would have thought, you know, you can get to your second, but I would have thought your first response to the question would have been to deny that you say it's clear because the Supreme Court of Michigan has said so. I thought your argument is it's clear because it's clear. Justice Scalia, that was my second point. Ah, okay. It should have been your first point. The premise is simply wrong. You're saying it was clear because the statute's clear. It was clear. And if any Michigan court had had the opportunity to actually decide it on the merits in light of this 200-year history of Michigan being a criminal code State, it was clear. And so this is the point when a State court decision is most defensible and most expected, applying the plain language of a clear statute in accord with State principles. Kennedy, are there any States with a statute identical or close to the Michigan statute that have interpreted the statute to say it does include diminished capacity? Justice Kennedy, I'm not aware of this. This statute is fairly well tracked to the common law tradition, which indicates that diminished capacity is not a defense. I'm just curious to know if any State courts have reached the opposite conclusion under a statute like this. I'm not aware of any other States that have the same statute and have addressed the question one way or the other. I do know that the language of the Michigan statute is fairly unique. If you look in the criminal law treatises, we're kind of in a category of only a very few States that, you know, on the one hand define mental illness and mental retardation, do not define or mention diminished capacity, and yet still have this guilty but insane option, which is something that Michigan common law did not have, but then that was added in the 75 statute. So it's a little bit unique. I think it's also unique to Michigan that we have this 200-year criminal code history, which, if you're interested, you can read all about it in the In re Lamphere case that we cite on page 4 to 5 of our reply brief. But it's when you put those things together that really make this such an easy case. Kagan. Well, General, I guess I wonder whether it's relevant what the statute really says as opposed to what courts said it says. I mean, sometimes judges make errors. And our law is dotted with places where courts have made errors and said that things mean what they don't mean or don't mean what they do mean. And, you know, we expect people to follow what the court says is the law, even if there's really a better reading out there. And also we think that people should rely on what the court says is the law, even though there's really a better reading out there. And so, you know, what does it matter if we come out and say, you know, what were these crazy Michigan courts doing? If that's what they were doing, it seems as though people had a right to rely on that. Well, the expectation certainly is that people will rely on Michigan statutory law. And I concede that this would be a more difficult case if the Michigan Supreme Court in, say, 1990 had come out in a published opinion and said the exact opposite of what it said in 2001. Obviously, that's not what happened here. But ultimately, you know, the question that would have been on Mr. Lancaster's mind back in 1993 when he shot and killed Tony King was, does Michigan law prohibit me? Will it punish me if I kill someone? And clearly he had to know that. And if he had looked at the 1975 statute, he would have seen that diminished capacity was not mentioned there. So to the extent that he wanted to rely on that defense, he wouldn't have found it in Michigan's codified law. You know, now I know the argument on the other side is, well, we have these other cases which, you know, mention the doctrine, kind of assume without deciding that it's out there. And he wants to assume that he has all the knowledge of that, but not the knowledge of the background principle that Michigan won't add affirmative defenses to a statute through a judicial action. And if you're going to impute any knowledge to him, and we submit that you probably shouldn't, then you've got to impute all the knowledge of Michigan law, the plain language of the statute and the interpretive principles that should guide what that statute means. He knew that killing someone was wrong. Unquestionably, he was on fair notice of that. And just like in Rogers, this diminished capacity defense after 1975 was never relied on by any Michigan court to either hold someone guilty or to acquit them or to find that there was ineffective assistance. It just was not the kind of well-established principle that could possibly make the Carpenter decision either indefensible or unexpected. And then when you layer that on top with Edpa deference, you know, really this is about as simple as it gets. There is no decision of this Court, not Rogers, not Bowie, not Fiore, not Bunkley, any court decision that is contrary to or misapplied in this Michigan court of appeals opinion. Unless the Court has any further questions, I'll reserve the balance of my time. Thank you, counsel. Mr. Mogill. Mr. Chief Justice, and may it please the Court. At the time of his offense in this matter, Respondent had a well-established, uncontested right to present evidence of diminished capacity in order to negate the elements of premeditation and deliberation in the first-degree murder charge against him, and he did assert that defense at his first trial. That trial was rendered unfair by the prosecutor's Batson error. Respondent was not allowed to present the same defense at his retrial, however, because 8 years after his offense, the Michigan Supreme Court unexpectedly changed the rules in Midstream, holding in Carpenter that a statute that had been diminished capacity did not express an intent to abolish any defense of diminished capacity, but the Supreme Court held that it had been abolished. That was fundamentally unfair to Respondent, all the more so because if the Michigan courts had ruled correctly on the Batson issue, retrial would have occurred before 2001, and there's no question, but that Respondent would have been able to raise the diminished capacity. Scalia. Oh, he would have been able to raise it. There's a lot of question about whether it would have been successful. Because if it had gone up to the Michigan Supreme Court, the statute was in effect during his first trial? That's correct. He could have raised it, but if it went up to the Michigan Supreme Court, it would have had the same result as here. With all due respect, I'm sorry. And your only defense would have been, oh, it's a great surprise. But I don't see how it's a surprise if the Michigan law has been, as the Solicitor General of Michigan has described it, that there's a clear tradition. If the statute addresses the area, the courts will not supplement it by common law additions. Did he not know that? With all due respect to opposing counsel, our view of the law is entirely different. Michigan recognizes the common law in its Constitution. Michigan law has been firmly established that the diminished capacity defense existed by 1973. Why do you say it was firmly? Do you contest the assertion by the Solicitor General that there is no case which acknowledged and held the defense of diminished capacity? I disagree. Is that wrong? Yes. What case lets a defendant off on the basis of diminished capacity? The let somebody off? Well, first of all, we're not talking about everybody. Scalia, in Lynch itself, in 1973, Ms. Lynch was charged with first-degree murder for the starvation, in relation to the starvation death of her infant. The trial judge declined to permit, declined to permit her to offer psychiatric testimony to mitigate to second degree. The court of appeals reversed, indicating that evidence, mental health evidence of the kind she wanted to offer, was admissible to establish diminished capacity, that is, to negate the element of premeditation and deliberation. Once that case was decided, there is one direction only in Michigan law from 1973 until Carpenter, by surprise, in 2001. Yes, the statute was passed in 1975, and just 3 years later, in 1978, Mangiapane decided that diminished capacity comes within the definition of legal insanity. The phrasing in the Court's opinion is very significant, and it's much more than opposing counsel suggests. The Court stated explicitly, we find that the defense known as diminished capacity is codified within the definition of legal insanity. Once that happened, then that required an accused who wanted to raise a diminished capacity partial defense to comply with the procedural requirements of the new statute. From that point forward, it was clear that diminished capacity — and these are published court of appeals decisions, so they are binding precedent statewide in Michigan unless or until reversed or modified by the State supreme court, the legislature or a constitutional amendment. Once that happened, there is not a case, including in Carpenter itself, where the prosecution objected to the admissibility of diminished capacity evidence. It was so well established, it was beyond question. It was so well established. Ginsburg's question that was asked was, on the bottom line, the end of the day, did anybody get sentenced less? Did it affect the outcome? You gave a case where a defendant was allowed to raise diminished capacity, but was — are there cases where the defense was successful on merits? Justice Ginsburg, I think that's a very important question. The closest I can come, the first part of my answer is in the Griffin case in 1989, in an order which was a dispositive order and therefore was precedent, the Michigan supreme court disposed of an application for leave to appeal by vacating, remanding a case for an ineffective assistance hearing because of defense counsel's failure, inter alia, to consider a diminished capacity defense. That order could not have occurred unless the supreme court had determined that diminished capacity was a valid defense. The second part of my answer is that the Supreme Court would have done that if it thought that at least, at least it was arguable. I respectfully submit that under Strickland analysis, no. If it's not an established defense, if it's not something that would arguably come within the Strickland framework, there would not have been a remand. That would have been a question of a lawyer trying to be creative, but it wouldn't implicate Strickland principles. Kennedy, I'm a little surprised at your answer. And Justice Scalia's question indicates the same. If the law was as well settled as you say it was in the appellate courts, then it seems to me certainly counsel should raise it and is arguably deficient for not doing so. Whether or not he'll prevail at the end of the day is something quite different. Justice Kennedy, I believe that the basis for a remand in a case like this, and this is not an unusual kind of a situation in practice, is where the law is clear, then the remand is to determine the factual basis for the defendant's claim, were the facts such that a reasonably competent attorney should have been expected to investigate and raise it. Roberts. You said your view of the law was, you know, so well established as to be beyond question. That is the standard under AEDPA, right? You have to be that right to prevail, right? What I have to establish is that the decision of the Michigan court of appeals here was objectively unreasonable. And whether it's beyond question, I think we certainly have objectively unreasonable ruling for the reasons that it was without not only was it well established and I want to weave into this the second part of what I'd like to answer of Justice Ginsburg's question. I think it's very important in understanding the question of reversals or not, what the lay of the land was, because where you have a framework that allows a defense to be raised and prosecutors aren't objecting, the application is going to be a factual matter for a jury to decide. So it's not going to be something that's going to percolate up into appellate legal issues. It's going to be successful sometimes, it's not going to be successful sometimes, and there are no statistics on that. But it doesn't — it won't present a legal issue, and that's in no small part why the question of, well, what about a reversal? Alitoson In Griffin, you describe Griffin in your brief as follows. The Court vacated, reversed, and remanded the decision below based on, quote, Defendant's claim that trial counsel was ineffective for failing to explore defenses of diminished capacity and insanity. Verrilli, and insanity. So it wasn't specifically — it wasn't limited to diminished capacity. Verrilli, and that's why in my brief, it was insanity in general. Verrilli, No. It was both. The insanity defense is separate from diminished capacity, which is a partial defense. In fact, at Respondent's first trial, prior counsel had raised both. At retrial, I only wished to raise the diminished capacity defense. The law recognizes the difference between the two in Michigan. Had diminished capacity not been a recognized defense, the Court's order, I respectfully submit, would have been worded just with respect to insanity. There would have been no legal basis for arguing — excuse me, for including the reference to diminished capacity. Scalia. Mr. Mogill, as I understand your burden here, it's not enough to show that Michigan law seemed to be what you say it was. But it has to have been what you say it was. And there was an evulsive change by the Supreme Court. Mogill, I agree with that, Justice Scalia, and I think that's what we have. We have, from the text of the statute, Scalia It's hard to believe that, given the clear text of the statute. The problem, I respectfully submit, is that nobody in Michigan until Carpenter and I — that sounds like an extreme statement, but again, the record is clear. Prosecutors weren't objecting. There's a State Bar Committee on criminal jury instructions whose responsibility it is to come up with standard jury instructions on areas of law that are agreed upon and routinely enough raised in court to warrant a standard instruction. That committee is comprised of judges, prosecutors, and defense attorneys. In 1989, that committee promulgated a diminished capacity instruction. That's how well established it was. Scalia Now, if a prosecutor raised that objection, knowing that the court of appeals would reverse the exclusion, right? I mean, it's clear what the court of appeals would have done, right? Mogill, Yes. Scalia And once the court of appeals reversed it and said the trial was infected with that error, could the defendant be retried? Mogill, The — what would happen, because he's convicted, and the — Scalia I'm sorry. He's convicted for second instead of first, but he's retried on first. Mogill, That's right. That's right. Mogill, But that's not the question. Scalia Could he be retried on first? Mogill, No. But — Scalia Well, then you'd be crazy to raise it as a prosecutor. Mogill, Justice Scalia, the answer to your question is encompassed by the statutory scheme, which requires advance notice. A defendant can't offer diminished capacity evidence in the middle of trial. A defendant has to give 30 days or whatever other time set by the judge notice, or had to at the time. If the prosecutor in any case believed that such evidence wasn't admissible, the prosecutor had plenty of time prior to trial to seek an in limine ruling from the trial court, to seek an interlocutory appeal from the Michigan court of appeals. Scalia You could get an interlocutory appeal on that. Mogill, Absolutely. Scalia Okay. Mogill, And that's why I'm saying that the court has been seeking interlocutory appeals. We have, again, it is so well established, there's not a contrary decision, there's not a question raised in any opinion or any decision. Breyer How many holdings are there? Mogill, There are many mentions. Breyer I think the answer is zero, right? I mean, I looked at your brief and then I looked at their brief and they say the answer is zero. Mogill, Lynch is a holding. Breyer And the holding is that, the whole pure holding would be the trial court judge says, no, you cannot raise it, okay? The defendant is convicted and appeals. Mogill, Yes. Breyer And then he says to the appellate court, you wouldn't let me raise it. And the appellate court says, you have a right to raise it. Mogill, And that's exactly Lynch, Justice Breyer. Breyer That is Lynch. And Lynch is in what year? Mogill, 1973. Breyer In 1973. Mogill, Okay. Breyer So we have one. And was there any other case in 1973, this is 10 years before, was there any other case in which same pattern of facts and they said the same thing as Lynch? Mogill, I'm not aware of any. Breyer So we got Lynch on one side. Is there any case, this is an intermediate appeals court, is there any case in which the defendant says, I'd like to raise it, the judge says, no, convicted. Appeal. And the intermediate court of appeals says, defendant, you're wrong. Mogill, The answer to your question, Justice Breyer, is there is no such case. And the reason why. Breyer So in all this period, from 1973 until 1995 or whatever. Mogill, 93 was the offense. Breyer Carpenter. Mogill, No, 2001 was Carpenter. The offense was 93. Breyer All right. There is exactly one case on point which does favor you, and there are zero cases that favor them, is that right? Mogill, If you talk holding only and if you discount Mangiapane. Breyer Mangiapane was a lot of words, but the holding was not noticed, isn't that right? Mogill, The holding was, but there's no reason for the court to raise that question  Breyer So we've got one, we've got one. One for you, zero for them. Mogill, If I can supplement that, Justice Breyer, one of the things, one of the points this Court looked to in Rogers was how many times the year-and-a-day rule had been mentioned, and that's this Court's word, in Tennessee decisions. And so one of the things we did, and that's the addendum in our red brief, is look at how many times there are mentions, all of which are favorable, not one of which raises even a question, of diminished capacity in Michigan. Scalia Was that, how often was it mentioned in intermediate court opinions? Mogill, We have four mentions in the Michigan Supreme Court and 33 in the Michigan Court of Appeals between 1975 and 1993, and we have over 100, about 100. Scalia Four mentions in the Supreme Court that say what? Mogill, Well, Griffin is one of them, and then you have, yeah. Scalia The Missing Children's Court.  And the law has been determined to be X simply because intermediate State courts have uniformly held it to be X. Never mind assumed it to be X. Have held it to be X. Mogill, I don't know of a particular case, but to answer your question, Justice Scalia, the law in Michigan is clear, as stated by the Michigan Supreme Court, that a published court of appeals decision is precedentially binding statewide unless and until reversed by the Supreme Court. So the fact that Scalia It doesn't mean it's right. Mogill, No. But in terms of it being  But you have to show it's right. Mogill, No. I have to show that it's the law of the State. Scalia What's the law? Mogill, I have to show that it is the law of the State, and it was the law of the State from 1973 forward. And I would like to supplement that, if I might. Scalia I'm sorry. Go ahead. Mogill, When Lynch was decided, it wasn't acting on something new. The court of appeals opinion indicates that what we're doing is nothing novel, because the diminished the right to present diminished capacity evidence to rebut and allegate the elements of premeditation and deliberation grows out of a 100-year history in Michigan. Roberts Well, but the Lynch case was 2 years before the Michigan legislature adopted the statute that we're dealing with here, right? Mogill, Yes. Roberts And that's where you're putting not all of your eggs, most of your eggs, right? Mogill, No, I'm, that is, that's an egg. I think I've got a pretty full basket. Roberts The whole point is that the law made that moot, because the law under Michigan did not specify diminished capacity, and it's a code State, so you only get what  I think Lynch has a good law. Mogill, I respectfully disagree with that statement by Brother Counsel. The, the, and that's why I quoted Article III, Section 7 of the Michigan statute. Roberts Well, but you'll at least, well, maybe not. I mean, would you acknowledge that the force of Lynch was arguably diminished by the fact that Michigan passed a statute that did not mention the diminished capacity defense 2 years after it? Mogill, I would if the facts of the subsequent litigation supported that interpretation of the statute. To the contrary, every case, Mangiapane, it wasn't a first, it wasn't an explosive holding. Breyer, There were no others, so now I've reduced your 1 to nothing to like .01 to nothing, because it favors you, Lynch, yes? But it was, as the Chief Justice just pointed out, and now you've already said there were no other cases. Mogill, No other holdings. But we have many, many mentions. We have on the ground consistent reliance by prosecutors, defense attorneys, and judges. Sotomayor That's your whole point, isn't it? You can't prove a negative, because if everybody accepts after Mangiapane that the defense exists, then trial courts are not going to be excluding it on the grounds that the statute excludes it, because that's the whole point you're making. Mogill, And which gets me to Rogers, and we turn to the questions of fundamentals. Sotomayor Do you have any, is there any evidence of a trial court holding an exclusion? Mogill, There's nothing. Sotomayor Or even suggesting one. Mogill, It is so extreme, Justice Sotomayor, that even in Carpenter itself, the prosecution did not contest the admissibility of diminished capacity evidence as a trial court. Breyer, But that's because everybody agrees, I think, I agree with you on this anyway. I agree the bar put it in its instructions, and if the bar puts it in the instructions, people tend to follow it. That's true. So it's not surprising that a lot of people tended to follow it. But as far as court decisions are concerned, we have now what I'm trying to think of as a pre-statute. I give you a little credit on that. That's Lynch. Pre-statute, and we have what I might sort of exaggeratedly refer to as the great mentioner. We've noticed the great mentioner is often wrong. And here, even though they are judicial mentioners, they get something. I don't know how much in this scale to give them. Mogill, Well, with all due respect, the standard that this Court set in Rogers is whether the decision in Carpenter, in this case, would have been unforeseeable and indefensible by reference to the law as previously expressed so that it can be applied retroactively. Breyer, Can you think of a Federal case where the – I see what we have. I'm now adding up the something for Lynch, the something for the bar, which is a something, and then the fact that some courts have quite, not surprisingly, tended to follow it, and there were others that mentioned it favorably, but not the Michigan Supreme Court.  It did mention favorably as well. Breyer, All right. So we've got that. Now, actually, that Kentucky case, was it, Tennessee? Rogers? Yeah, Rogers. That went against you. I think the principle that the Court established there goes very much in favor of it. Can you think of any Federal precedent on this issue that's come even close to that being sufficient? I think the closest point, and it's important, and it goes, Justice Scalia, to respond to your point about lower court, reliance on lower court opinions, is in Lanier, when the question concerned what's the scope of the statute that's at issue here. And this Court very explicitly stated that it's permissible for the world outside of court to look at lower court decisions, court of appeals decisions, in terms of what had been reasonably expressed. That's consistent. If you prevail here, it may well change the dynamic for State supreme courts. State supreme courts, much like us, they wait until courts of appeals have issued their opinions. They wait to see how the practical application of those works insofar as the fairness of the trial. They wait to see about scholarly commentaries. And then they take the case. If you prevail, State supreme courts are going to say, you know, if we don't take this case, even though it does not present the issue as clearly as some later case might, if we don't rush in, then we're going to be foreclosed. I think you're proposing a dynamic which makes the Federal courts intrude on the way in which State courts choose to develop their law. Justice Kennedy, thank you for that question, but I respectfully disagree. The relief we are requesting here is simply that while the Michigan supreme court was entirely free to interpret this statute any way it wanted to prospectively, so long as it didn't conflict with some other decision of this Court, the question is what about applying it retroactively? And this Court, and Bouie and Rogers, has set out clear principles for when a court that wants to reverse ground can do that or not. It's consistent with fundamental fairness, principles of notice, foreseeability, et cetera, all of which go in our direction here. An interesting contrast, and a useful contrast. I'm sorry, what is the unfairness here? Do you think there's a reliance? There's not a reliance, nor is there an element. So what is the unfairness? In both Bouie and Rogers, this Court made it clear that reliance is not an issue. The unfairness, and that's a very important point, Justice Alito, is that by eliminating the right to present this category of evidence, mental health evidence that would show, if accepted by a jury, that the Respondent was guilty of second-degree murder instead of first-degree murder, what the Court was doing was expanding the scope of premeditation and deliberation. They were aggravating the offense. That is a fundamental unfairness. Ginsburg. But the case is very different from Bouie, which you rely on. In Bouie, it was the question of a rule that is governing conduct. People come onto premises. They have no reason to think that they are committing an offense if they don't leave when somebody asks them to, if they came onto the premise lawfully. So what the Court said in Bouie was that this is a regulation of primary conduct, and at the time these people acted, they had no reason to believe that what they did was unlawful. That's quite a different. I agree with that, Justice Ginsburg, except that at footnote 5 in Bouie, this Court explicitly rejected the notion that subjective reliance by the accused is even an aspect of the test for determining. It isn't subjective reliance. It's what was the law. And the Court said that the State supreme court interpretation of the statute was quite a surprise. Yes. And what the Court did in both Bouie and in Rogers was look at the underlying State law. In Bouie, the Court looked at the history of South Carolina law regarding trespass and found that until a year and a half later, it hadn't been construed to apply to a failure to leave as opposed to an entry. In Rogers, the Court surveyed the very sparse Tennessee authority on the year-and-a-day rule. That same analysis here will lead, must lead to a conclusion that all the law in Michigan and, again, minimal holdings for the reasons Justice Sotomayor indicated, the minimal holdings, but all the mentions and the holding go in the direction of this existed. It was relied on. It wasn't contested. Alito, I don't see how the question can be whether there was a change in Michigan law, because we can't second-guess the Michigan supreme court about what Michigan law was. Michigan law is whatever the State supreme court says it was. We might agree, we might disagree. So I think we have to start from the proposition that the law didn't change, because that's what the Michigan supreme court said. So there must be some other ex post facto principle that applies when there's a certain type of unfairness. And I wonder if you could articulate what that principle is. I would be happy to, Justice Alito. But first I want to address your point about having to rely on Michigan supreme court's determination of Michigan law, because this Court has made it very clear that you can't let a State court relabel something in a way that avoids Federal constitutional review. Chief Justice Rehnquist spoke to that point in Collins v. Youngblood. Justice Kennedy, you spoke to that in your dissent in Clark. Justice Scalia, in your dissent in Rogers, you spoke to the point, I think in an apt phrasing, that this Court will rely on a State court's reasonable determination of State law. Yeah. True dissents is what you're referring to? I'm sorry? No. The majority of the opinion of the Court in Collins, but it's also a well-established principle, and I also wanted to note that the two other mentions, but it's not a principle that's been in dispute. The Court's analysis in both Bowie and Rogers also supports what I'm saying, because the Court independently looked at South Carolina law in Bowie. The Court independently looked at Tennessee law in Rogers. Well, I think what you're arguing is that under certain – in evaluating certain constitutional claims, the question of what State law is, is not dispositive. I don't think you're arguing that the Federal court has a right to tell a State court what State law is. This Court certainly does not have a right to tell the Michigan Supreme Court going forward what State law is with respect to diminished capacity. Well, I mean, suppose this were a diversity case. Can a Federal court say, you know, we think that the decisions of the intermediate State Supreme Court were correct, and this new decision by the State Supreme Court is incorrect, so we're not going to follow that? No. But this is not that. That's not this case. This case involves reliance on this. It's not this case because there you're trying to figure out what State law is. Here you're applying a constitutional principle. We're trying to apply a constitutional principle. So what is that? That gets me to the second part of my question. What is the constitutional principle that doesn't depend on what State law was? The constitutional principle is that Respondent had a right to present a defense that existed at the time of his offense. And unless it was clearly unforeseeable — excuse me, unless it was unforeseeable and indefensible by reference to law that had been expressed prior to the time of the conduct, that that law might change, which we don't have here. And, Justice Breyer, I think that this phrasing also goes to respond to your question. The formulation in Rogers that confines looking to the law as of the time that the conduct occurred, and even if you go forward, there was nothing to suggest an alternate interpretation of the statute, a questioning opinion, nothing that would suggest  We also have the fact that, unlike the year-in-a-day rule, diminished capacity as a doctrine is well-supported and increasingly supported by medical and mental health evidence. It's the exact opposite of the year-in-a-day rule in that regard. It also furthers. Alito, this is a due process issue, right? That's exactly it. And so why is it unfair? Why is there an entitlement under due process to assert what appears under the law of the State immediate court decisions to be a valid defense, but is later determined never to have been or not to have been at that time a valid defense? What is the unfairness involved there? The unfairness is because it was sufficiently well-established. It was thoroughly well-established as a matter of Michigan law. So Respondent and everybody else in Michigan had a right to rely on it. In fact, if this Court were to reverse the Sixth Circuit, Respondent would be the only person in Michigan charged with a crime prior to Carpenter who would not be allowed to present a diminished capacity defense at a fair trial. That's how extreme the violation was. Breyer, what do you think is the alternative, is you're going to allow the bar associations, helpful as they are, by writing instructions to determine issues that courts themselves have never determined, or at least not authoritative Supreme Courts? And that's a worrying matter where you're trying to create coherent systems of law. If I can briefly, quickly respond, Justice Breyer, the — I disagree that we're — that I'm in any way suggesting that turning anything over to the bar association, that the fact of that instruction is, I think, strong evidence of the reasonableness of reliance of the bench and bar in Michigan, but not looking to turn authority over to anybody. Thank you very much. Mr. Bursch, you have 13 minutes remaining. Thank you, Mr. Chief Justice. I think we actually have a lot of areas of agreement after 45 minutes of oral argument. Number one, Justice Breyer, is that there really is only one case in Michigan that reaches the holding that Mr. Carpenter would like, that you can assert this defense, and that was the Lynch case in 1973, which preceded the 1975 statute. And so under well-established Michigan law, again, you know, In re Lamphere, Reese, which was their 2012 decision reapplying In re Lamphere, that code occupied the field. And at that point, the common law decision no longer existed. I think he contested that. I think he never went further into it, but he seemed to disagree with the proposition that where there is a Michigan statute, it can't be supplemented by the common law. I did not hear him say that. And if you go back and you read Reese and In re Lamphere, I don't know how anyone could possibly disagree with that. There are certainly areas. Roberts, if I could just interrupt you. He did challenge my premise when I presented that to him, so I do think he disagrees with it. Okay. Well, then I disagree with that. If you look at In re Lamphere and Reese, it's well settled in Michigan that when the Michigan legislature speaks to a particular subject matter in criminal law, that the code controls and the common law cannot supplement it. The words of the Michigan Supreme Court and Reese itself were, the courts have no power to add an affirmative defense that the legislature did not create. And I really don't think there can be a dispute about that. Ginsburg. Is this a one of a kind in that whatever the law was, it's clear from 2001 on. Are there any other people who are similarly situated, who committed a crime before 2001, but were tried after? I'm not aware of any, Justice Ginsburg. And the reason for that quirk is because his habeas process, by coincidence, happened to take such a long time. It's pretty rare that we're up here on a case where the murder actually took place 20 years ago and the trial shortly after that. But quirks in how long litigation happens don't determine whether people get the benefit of changes in law or not. What matters is the standard that this Court applied in Rogers and Bowie. Was the change, if there was a change, indefensible and not expected? Was there anyone prior to 2001 who couldn't raise a defense like this, who was precluded from doing so because a court thought, oh, you know, the statute really clears the field and this defense is not available? Can you point to anything? We can't point to anything, just like they can't point to anything. You've got, you know, in 1975. Kagan, to just a lot of people who were raising this defense. Right, and they can point to cases that assume without deciding that the defense might exist. And then it wasn't until 2001 when the Michigan Supreme Court became the first Michigan court to look at it. And I forget now who mentioned this. I think it was Justice Kennedy, that the Michigan Supreme Court did what this Court often does. It waited for the right case to present itself. And when it did, it applied the plain statutory language in accordance with Michigan and Irvine. But this is a just – I'm sorry. Why was it the right case? The parties didn't even raise it, did they? Well, you know, it could be because the Michigan Supreme Court thought, you know, there's enough confusion because of the mentions in the lower court that it's time that we address this. I don't know why the Michigan Supreme Court took it up in Carpenter. What I do know is that fair-minded jurists, which is the habeas standard, could agree that Carpenter was neither indefensible nor unexpected. And, you know, it's not a head-counting business, but I would note that the Michigan court of appeals here was unanimous. Previously, the Michigan court of appeals in Talton decided the year after Carpenter reached the exact same conclusion with respect to the due process question. So we've got six Michigan appellate judges looking at this. You know, going back to what the Michigan law said, I also heard my friend mention that the Griffin case, this is the three-paragraph order where they remand for ineffective assistance. Well, Griffin is one of the cases that the Michigan Supreme Court discusses in Carpenter. And in the very next sentence, the Supreme Court says, however, we have never specifically authorized the defense's use in Michigan courts. You know, it just wasn't there. What you have are these mentions, and then, as Justice Breyer mentions, you've got jury instructions which are promulgated by the State bar, not the State supreme court, or by any court for that matter. And what you have to ask yourself, is it objectively unreasonable? Is it beyond any possibility a fair-minded disagreement that a Michigan court of appeals panel could conclude that Carpenter was both indefensible and unexpected? And the other thing is that the defense is not going to be able to do that. Breyer. And do you have any idea, a rough estimate, how many cases there were between, say, 75 and 93 where this defense was raised? Well, all we have are the mentions in the appellate court. We have no record. About how many? About. About 37, I believe. It was four Michigan supreme court opinions and 33 court of appeals. So it was 37. Now, of those, the Michigan supreme court itself said their four decisions didn't say one way or the other. Of the other 33, 32 of them weren't even binding on other Michigan court of appeals panels. As we explained in our brief, the Michigan court of appeals wasn't bound to follow any panel decision prior to November 1, 1990. So those weren't even binding on the court of appeals itself. If you're thinking about what's firmly established, you know, there were no roots at all to these mentions. It would be like walking past your neighbor's yard. You know, if there's an oak tree there, you expect it to be there the next day. You know, but if there's a small weed, you expect it to be pulled up and rooted out. And that's exactly what happened here when the Michigan supreme court finally addressed the question. You rely on Reese as establishing the principle that you cannot supplement the defenses in a criminal statute. But Reese was a 2012 case. Right. I mention Reese because it's the most recent application. It cites In re Lamphere, which is an 1886 decision, which itself references the 1810 Territorial Act, which abolished common law criminal principles if you have a statute. Do you have something like in the middle? There are many cases in the middle. There's at least a 1990 case, although I can't recall the name. If you just keysight or shepherdize In re Lamphere, you'll find scores of cases that rely on this proposition. Sotomayor, I'm sorry. Then you're arguing Lynch was wrong to begin with, because what you're arguing is that it created a common law defense that the courts say you can't do under Michigan law. Right. Exactly. You've got Lynch, which was the common law. No, no. But you're saying to me it was wrongly decided under this general. Oh, no, no, no, no. To be perfectly clear, what In re Lamphere and Reese and everything else say is that when the legislature has spoken to a particular area, then the courts cannot supplement. They had never spoken about mental capacity defenses prior to 1975, and so the slate was free for the courts to do what they wanted. So there's nothing wrong with Lynch in 73. The problem is continuing to assume that there was a defense that wasn't in the 75 statute. If you were representing a defendant in this position, you certainly would have raised the diminished capacity defense prior to Carpenter, wouldn't you? Undoubtedly. But I don't think it means that fair-minded jurists could not possibly conclude that Carpenter's defense was both indefensible and not expected. And if you were a prosecutor, you would not have objected to that defense, would you have? Well, I don't know. If I was a prosecutor, I would have looked at the plain language of the statute. Do you have any reason to think that any prosecutor ever objected to such a defense? I don't know one way or the other. We just don't have the data for that. So ultimately, what we're talking about here. I assume you'd need a case in which the prosecutor was pretty clear that a diminished capacity defense would prevail, otherwise it wouldn't be worth the candle, right? That's exactly right, Justice Scalia. But what's in the 37 cases then? They got up there. I assume the defendant must have brought them. If he must have brought them, he must have wanted to raise the defense, and somebody said no. No, I don't believe that there was a single case in those 37 where someone tried to raise the defense and the court said no, nor was there a case where the prosecutor said you can't raise the defense and the court said yes. It was just a number of cases. And, you know, Mangiopane is really the paradigm example. The question was, did they give notice? If the defense exists, is it part of the statute? And all the Michigan courts agree that that has to be the case. But it's not till Carpenter where the Court finally says, is it part of the statute, and says no. Kagan. Just to go back to Justice Breyer's question, I mean, there may be no way you can answer this, but are we talking about, you know, do five people a year, did five people a year raise this, or 20, or 100? I mean, what kind of numbers? You know, all we've got are the appellate decisions referencing it. So if we've got 37 cases Right, which we can't really tell because nobody was objecting to anything, right? So you've got 37 cases over a course of 18 years, 75 to 93. You know, that tells us maybe two cases a year in a system that processes thousands of criminal cases. You know, there was nothing here that would make the Supreme Court's application of the plain language so indefensible, so unexpected, that no reasonable jurist could possibly have reached the same conclusion as now two unanimous Michigan court of appeals panels have. I wanted to touch briefly on the unfairness point, and Justice Ginsburg, I believe, brought up Bowie. And Bowie is really the perfect analogy, because, again, under the AEDPA standard, it's Lancaster's burden to show that the court of appeals decision here was contrary to or a misapplication. And to the contrary, it was the exact application of Bowie. In Bowie, you had a clear statute that was very narrow, and the State court expanded it in a very unexpected way. And this Court found that was indefensible and unexpected. The exact opposite happened here. You had the Michigan Supreme Court applying very narrow statutory language, exactly the way it was written, in accord with 200 years of interpretive principles. So really, the problem here is not any unfairness. The problem is the Sixth Circuit, yet again, not applying habeas deference under the statute or this Court's precedent, and disregarding another Michigan State court decision where reasonable jurists could have reached different conclusions on this. It's not our burden to demonstrate what the law was or wasn't. All we have to show is that a reasonable jurist could have reached the conclusion the Michigan court of appeals did here. And there doesn't appear to be any question that's the case. Scalia, you want us to say yet again when we write our opinion? Yes, Justice Scalia. If there are no further questions, thank you very much. Thank you, counsel. The case is submitted.